## THE SINALOA.

### THE FRANCIS L. ROBBINS.

(District Court, W. D. New York. August 28, 1909.)

COLLISION (§ 102ª)—STEAM VESSELS MEETING—NEGLIGENT NAVIGATION.

 A collision by daylight in Duluth-Superior harbor between the steamer Robbins passing out and the steamer Sinaloa going in, and which had just passed through the broken Interstate Bridge, *held* due to the negligent navigation of both vessels; the initial fault being that of the Robbins, which, after agreement on a passing signal to the right, kept too far to the left side of the channel, making it difficult for the Sinaloa, after passing the bridge, to navigate properly, and the latter being in fault for not sooner observing the improper position of the Robbins and navigating accordingly.

 [Ed. Note.—For other cases, see Collision, Dec. Dig. § 102.*

 Signals of meeting vessels, see note to The New York, 30 C. C. A. 630.]

In Admiralty. Suit for collision by the Robbins Transportation Company against the steamer Sinaloa, and cross-libel against the steamer Francis L. Robbins. Decree for division of damages.

Goulder, Holding & Masten, F. S. Masten, and F. L. Leckie, for libelant.

H. R. Spencer, for respondent.

HAZEL, District Judge. There was a collision on October 15, 1906, in the Duluth-Superior harbor, between the steamers Francis L. Robbins, a steam propeller 400 feet long and 50 feet beam, owned by the Robbins Transportation Company, libelant, and the Sinaloa, 440 feet long and 50 feet beam, owned by the respondent, the Superior Steamship Company; the Robbins receiving a cut or opening on her port bow from the stem of the Sinaloa of about 8 feet in length running down below the water line. The libelant corporation claims to have sustained damage amounting to $17,000 in repairing the Robbins. A cross-libel has been filed, wherein damages to the Sinaloa are claimed in the sum of $500.83. The Robbins, laden with iron ore, had just cleared the Northern Pacific Railroad Bridge downbound. She had previously blown one blast of her whistle to the Sinaloa, which was coming up the harbor from the opposite direction and then nearly a mile away, to indicate her intention to direct her course to starboard, so as to pass on the port side, and the Sinaloa had blown an answering assent. At this time the vessels could not see each other, owing to the bend in the river, and their view was also obstructed by the wreck of the Interstate Bridge and by piles of lumber on the dock. In the Duluth-Superior harbor there are two bridges, the Northern Pacific Railroad, and about 2,000 feet distant therefrom down the river the Interstate Bridge, which primarily had a swing, but which had been injured, and its two draws at the time of the collision were littered with the débris of the drawbridge and could not be used by boats in passing. In this situation one section of the bridge on the Superior, or south, side of the harbor, which rested on stone abutments, was taken away, leaving an opening or passway 270 feet wide between the abutments for up and down bound boats to pass through. Vessels and other water craft coming to the iron ore docks from points below the Interstate Bridge were required to skillfully navigate through this opening between the abutments and make a turn to starboard of about seven points to reach the drawbridge of the Northern Pacific Railroad, beyond which the ore docks were situated. After port to port passing signals had been exchanged, the Sinaloa continued on her course at slow speed of about three or four miles per hour towards the Interstate Bridge and the southerly opening thereof.

The Robbins, according to the Sinaloa, instead of seasonably complying with the single blast of the whistle which she had initiated, navigated on a course too far to the left of the channel or basin, continuing on a straight course, and then coming too close to the bridge, which sailing movement interfered with the Sinaloa turning to the right or starboard to enable her to pass port to port as agreed. The specific faults attributed to the Robbins are that she kept too far over to port, heading too closely to the bridge abutment, and then passing down to the bridge draw on a course nearly at right angles with it. A different claim, however, is contended by the libelant, and, if such claim is sufficiently supported by the testimony, the Sinaloa was solely at fault. In behalf of the Robbins it is claimed that, after she had blown the passing signal that she would direct her course to starboard, she proceeded in the usual and ordinary way towards the draw or opening on

the Superior side of the harbor, first porting her helm to cross the basin or harbor at a speed of about two miles per hour, and then starboarding slowly as soon as she came in line with the middle bridge abutment. Her master testified that when the Robbins approached the center projection he noticed that the Sinaloa was not waiting on the other side of the draw, as he anticipated she would do, but that she was coming through; that he immediately stopped his engines, preferring to drift, so as not to meet or pass the Sinaloa in the draw, and, having reached that conclusion, he gave the Sinaloa ample space to pass to port; but he testified that she did not swing to starboard, as she was called upon to do. The principal fault attributed to the Sinaloa is her omission to skillfully and properly maneuver to the right or starboard side, although it is also claimed that she should have remained below the draw, and that she proceeded through it at an excessive rate of speed. The testimony on the material points is discrepant, and the accounts of the manner in which the vessels were navigated are in such conflict as to make it difficult of reconciliation. It was a careless collision, and in my judgment a proper amount of precaution on the part of either vessel would have avoided it.

It is unquestioned that steamers navigating as in the present case are approaching each other end on, or nearly end on, within the meaning of rule 17 of the White law, passed February 8, 1895 (Act Feb. 8, 1895, c. 64, 28 Stat. 648 [U. S. Comp. St. 1901, p. 2891]), and that both the Robbins and the Sinaloa, in the circumstances, were bound to regulate their movements to starboard, so that passing one another would be on their port sides. It certainly comes within the category of negligent and unskillful seamanship if either of the vessels failed to seasonably alter her course to starboard. There is abundant credible evidence in the record to satisfy me that the Robbins navigated closer to the left of the channel than was usual or customary by vessels intending to pass through the temporary draw. Concededly the Robbins was required to comply with the custom of navigation, and her failure to do so by getting too close to the abutment, so as to interfere with the oblique movement to starboard of the Sinaloa, was a fault for which she must be held liable. By her erroneous navigation in proximity to the protection piling, she was prevented from straightening in line with the draw, but came in line on an angle of 45 degrees across the bridge opening, when she should have been well over to starboard. In this situation the collision was imminent, and could only have been avoided by immediate backing on the part of the Robbins; but this was not done.

After carefully considering the testimony, I have an impression that the Sinaloa, when she reached the draw, could by the exercise of vigilance have seen that the Robbins was too far over to port, and that she had not sufficiently or seasonably starboarded. The Sinaloa had assented to the Robbins passing on her left side, and according to her master she was proceeding at such a rate of speed that she should have anticipated passing the upbound steamer in the draw, and should have seasonably directed her course to starboard before her bows cleared the stone pier. Then there was nothing to prevent her doing so, although

173 F.—44

later, on account of her proximity to the abutment, it was probably too late to avoid the collision. The wheelsman of the Sinaloa testified in substance that if he had turned in the same angle as the Robbins there would have been ample room to pass in safety; that he was steering two or three points to the right of the docks just south of the draw. This concededly left the vessel on, or nearly on, a straight course through the draw; for, if skillfully navigated, she should have been on a slanting course, making her turn and heading well to starboard. The wheelsman further testified that, while coming through the draw, he swung the wheel a little to starboard, but was directed to "steady her a while," which obviously tended to again head her straight through the draw. At this instant of time the Sinaloa claims to have been so close to the abutment that an order to steady the wheel was necessary to escape coming in contact with it.

But, assuming the truth of this claim, it will not excuse her for navigating without having regard for the presence of the Robbins and her right to carry out the agreement to pass on her port side. If she had initiated her swing before her bow came abreast the stone pier, or lower end thereof, she probably would not have been in danger of striking the abutment. This view is thought to be abundantly supported by the evidence and the probabilities arising from the circumstances. Moreover, I think that the Sinaloa, by the exercise of proper diligence and carefulness, could have seen the Robbins before her pilot house reached a point outside the stone abutment. The wrecked bridge undoubtedly interfered with distinctly perceiving her movements; but, as the lookout of the Sinaloa was stationed about fifty feet above the water line, it is inconceivable that he could not at least have seen the spars and smokestack of the Robbins. I think the Sinaloa should have noticed the error of the Robbins in failing to sufficiently steer to starboard, and governed her own movements accordingly. Such a fault, in view of the circumstances, cannot be deemed to have been an error of judgment. The situation, perhaps, was not such as to require her to wait below the drawbridge; but her master had ample time to deliberate upon the manner in which she should pass the Robbins, and whether passing in the draw was fraught with danger. This is not a case where in a moment of sudden danger, precipitated by the misconduct of the Robbins, it became a question of stopping, or backing, or proceeding ahead. The masters of both vessels were familiar with the unfavorable conditions due to the wreckage of the Interstate Bridge, and therefore greater precaution on the part of both vessels in passing that point was demanded. The Robbins was primarily in error in not seasonably directing her course to starboard, while the Sinaloa must also be held in fault for not directing her course in such a way as to adequately turn to starboard, thereby contributing to the collision.

The damages, after ascertainment by a master, will be divided.